Russell H. CARTER, Appellant,

v.

NORFOLK COMMUNITY HOSPITAL
ASSOCIATION, INC., a Virginia
Corporation, Appellee.

No. 84–1256.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 11, 1985.

Decided May 8, 1985.

S.W. Tucker, Richmond, Va. (Hill, Tucker
& Marsh, Richmond, Va., on brief), for
appellant.

Alex T. Mayo, Jr., Norfolk, Va. (Kaufman & Canoles, Norfolk, Va., Martin A.
Donlan, Jr., Crews, Hancock & Dunn, Richmond, Va., on brief), for appellee.

Before SPROUSE, WILKINSON and
SNEEDEN, Circuit Judges.

SPROUSE, Circuit Judge.

Russell H. Carter appeals from the decision of the district court dismissing with
prejudice his § 1983[1] action brought
against the Norfolk Community Hospital
Association, Inc. (Hospital). His complaint
charged that the Hospital's revocation of
his professional privileges to practice medi-

---

1. 42 U.S.C. § 1983 (1982).

cine at the Hospital deprived him of a valuable property right without affording him due process under the Fourteenth Amendment. The district court's dismissal was based on its finding that the parties had settled their dispute by reference to an arbitration panel which had upheld the revocation.

Carter now contends, among other things, that the district court lacked subject matter jurisdiction over this § 1983 action based on the Fourteenth Amendment because no state action was involved in the Hospital's revocation of his privileges. He argues, therefore, that it was improper for the district court to dismiss his case with prejudice and that the court simply should have dismissed it without prejudice for lack of subject matter jurisdiction. We agree that the alleged participation by the Hospital in Carter's discharge did not amount to state action. The district court, therefore, should have dismissed this action without reaching the settlement issue. Such a dismissal, however, is based upon a failure to state a claim upon which relief may be granted, rather than on lack of subject matter jurisdiction as Carter contends. We affirm the dismissal on those grounds but remand for the district court's determination of whether it should be dismissed with prejudice.

I

Carter, a physician licensed by the State of Virginia, practiced at the Hospital from 1967 until mid-1980 when the Hospital revoked his privileges. In his complaint he alleged that the committees of the Hospital responsible for investigating and deciding his staff status acted unconstitutionally in revoking his privileges. Carter contended in his complaint that the Hospital's actions amounted to state action. This contention was based on his allegation that the Hospital accepted federal funds under the Hill-Burton Act,[2] received payments from Medicaid and Medicare, was subject to state and federal regulations, was exempt from state and federal taxes, and received unspecified support from the City of Norfolk, Virginia.

The Hospital initially moved under Fed. R.Civ.P. 12(b)(1) to dismiss on what it perceived to be a jurisdictional ground, that is, that its actions were not properly attributable to the State. Responding by affidavit, Carter supported his state action claims by averring that the Hospital terminated his professional privileges in order to appease the Colonial Virginia Foundation for Medical Care (Foundation), a private organization. He alleged that the Foundation, pursuant to contract with the U.S. Department of Health and Human Services, exercised certain controls over the Hospital and issued certain negative reports and recommendations which resulted in his dismissal. Carter averred that the Foundation exercised control over the Hospital by requiring that physicians be subjected to periodic peer review and by suspending or terminating Medicare or Medicaid payments to the Hospital for infraction of the Foundation's regulations. Carter's complaint does not allege any specific conduct on the part of either the Hospital or the Foundation which would indicate overt joint action relating to his loss of professional privileges; fairly read, however, the complaint, together with the affidavit, alleges a causal relationship between the Foundation's negative reports and his loss of staff privileges. The district court denied the Hospital's pre-trial motion to dismiss, holding that the complaint and affidavit alleged sufficient state action to support jurisdiction for purposes of § 1983.

Carter and the Hospital then agreed to submit to an arbitration panel the issue of whether his privileges should be terminated or reinstated. Carter agreed that if the panel recommended termination of his privileges, he would accept dismissal with prejudice of this suit. The Hospital agreed to "give great weight to the panel's findings and recommendations," but if it declined to follow the recommendations, both parties retained "any legal rights of [sic] defenses

---

**2.** 42 U.S.C. §§ 291, 291a to 291o–1 (1982).

to which either may be entitled." A three-physician panel was appointed and rendered a decision which appeared to recommend terminating Carter's privileges but was, in some respects, ambiguous. The district court interpreted the arbitration decision as upholding the position of the Hospital and dismissed the case based upon the settlement agreement.

On appeal, the parties have reversed their positions on the state action question. Carter now contends that the Hospital's actions are not attributable to the State and, therefore, that the district court was without jurisdiction to consider the merits of the case or the settlement agreement. The Hospital now asserts that its actions involved state action and, therefore, that the district court properly reached the settlement issue.

## II

We think that the court erred in its pretrial ruling that the Hospital's termination of Carter's privileges amounted to state action. The alleged state action was based on receipt of Hill-Burton funds, acceptance of Medicare and Medicaid patients, subjection to state and federal regulation, exemption from state and federal taxes, and submission to the Foundation's regulations. In *Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir.1982), decided after the district court's ruling, we considered whether a hospital's termination of a physician's clinical staff privileges was attributable to the State. We first reviewed the principles set forth by the Supreme Court in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), and held that participation by the Hospital in the Hill-Burton, Medicaid, and Medicare programs did not constitute a sufficient nexus under the *Jackson* rationale to establish state action.

The facts of *Modaber* are similar to those of this case, with one important difference. In *Modaber*, we decided only that the hospital, by the receipt of federal funds under the Hill-Burton, Medicaid, and Medicare programs, was not engaged in state action. Here, Carter, in effect, also alleges that the Hospital terminated his professional privileges at the behest of the United States government acting through the Foundation—a contention not present in *Modaber*. Carter alleges that this makes the Hospital a state actor engaged in state action. This contention presents an issue similar to the one decided by the Supreme Court in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982).

The plaintiffs in *Blum* sought injunctive relief against state officials responsible for administering the Medicaid program and regulating nursing homes in New York, contending that the officials were responsible for their transfers from a nursing home. The state agencies administering the Medicaid program required doctors to provide admission information concerning the patient's need for nursing home care and required nursing home personnel to monitor the patient's need for continuing care in the facility. The nursing homes could be penalized for failure to discharge patients whose continued stay was medically inappropriate: the State could impose fines and approve or disapprove continued payments of Medicaid benefits after a change in the patient's need for services.

*Blum* presented the issue of whether a nursing home's decision to transfer a patient to a facility providing a lower level of care constituted state action. It differs procedurally from this case in that there the State was the defendant and the decisive issue was whether it so controlled the nursing home's patient retention policies that it was responsible on the theory that the transfer by the nursing home was state action. Here, the Hospital, not the State, is the defendant, but as the Supreme Court pointed out in *Blum*, the principle is the same. *Id.* at 1004, 102 S.Ct. at 2786.

Justice Rehnquist, writing for the majority in *Blum*, stressed that private physicians, not the State, determined whether the patient's care was medically necessary and that the personnel of nursing homes decided whether to transfer or discharge the patient. *Id.* at 1006, 1008, 102 S.Ct. at

2787, 2788. He noted that the appellant's contention that the State "affirmatively command[ed]" the discharge or transfer was not supported in the record and stated without further discussion that such circumstances would present a different question. *Id.* at 1005, 102 S.Ct. at 2786. Comparing the nursing home's conduct to that of the public defender in *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), *Blum* concluded that although there was some government involvement in the business of the nursing home, the transfer decisions were essentially those of a private business entity. *Blum* acknowledged that the State could penalize nursing homes for failure to discharge patients whose continued stay was medically inappropriate, but decided that the discharge by the nursing home was not state action. Prior to reaching that decision, the Court said:

> [A] State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.

457 U.S. at 1004, 102 S.Ct. at 2786 (citing *Flagg Brothers, Inc. v. Brooks,* 436 U.S. 149, 166, 98 S.Ct. 1729, 1738, 56 L.Ed.2d 185 (1978); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 357, 95 S.Ct. 449, 456, 42 L.Ed.2d 477 (1974); *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 173, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 170, 90 S.Ct. 1598, 1615, 26 L.Ed.2d 142 (1970)). The Court specifically concluded, over Justice Brennan's vigorous dissent, that state influence on the nursing home through the implicit threat of financial penalties "is too slim a basis on which tó predicate a finding of state action in the decision [to transfer patients] itself." 457 U.S. at 1010, 102 S.Ct. at 2789.

Accepting as true the allegations contained in Carter's complaint and affidavit, they do not depict any government activity more involved than that considered in *Modaber* and *Blum.* He alleges, and we think correctly, that the Foundation acted as an agent of the United States Department of Health and Human Services. Although this is not entirely clear from the record, we assume that the Foundation was under contract with the United States to perform the functions of a Professional Standards Review Organization (PSRO) in a geographical area which included the Hospital. By statute,[3] a PSRO reviews the professional activities of area health care providers for the purpose of determining whether the care rendered by the provider was medically necessary, appropriate, and economical. A PSRO's review is conducted, in part, by local physicians applying professionally developed norms of care, diagnosis, or treatment typical of practice in the area. Negative reports by a PSRO may result in the exclusion of a health care provider from receiving Medicaid and Medicare payments. The purpose of such peer review is to eliminate abuse of the Medicaid and Medicare system—presumably abuses such as over-treatment and over-billing.[4]

In *Modaber* we held:

> Recipient hospitals undoubtedly "operate as integral parts of comprehensive joint or intermeshing state and federal plans or programs designed to effect proper allocation of available medical and hospital services for the best possible promotion and maintenance of public health." [*Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959, 967 (4th Cir. 1963), *cert. denied,* 376 U.S. 983, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964).] But the mere fact that the hospitals implement a governmental program does not establish the nexus which *Jackson* requires. The recipients do not act in an exclusively state capacity. Although health care is certainly an "essential public service," it does not involve the "exercise by a private entity of powers traditionally exclu-

---

**3.** 42 U.S.C. § 1320c (1982).

**4.** S.Rep. No. 92–1230, 92d Cong., 2d Sess. 254–55 (1972).

sively reserved to the State." [*Jackson v. Metropolitan Edison Co.*, 419 U.S. at 352, 95 S.Ct. at 454.] Although the hospitals are within a legislative design to better public health and are subject to extensive regulation, they remain solely responsible for providing the service and solely entitled to the profits therefrom. 674 F.2d at 1026 (other citations and footnotes omitted).

In addition to the receipt of federal funds such as we considered in *Modaber*, Carter alleges that the Hospital terminated his privileges in order to "appease" the Foundation, which had the power to terminate its Medicare and Medicaid payments. That vague allegation, however, sheds no light on what underlying facts might have amounted to "appeasement." Without more, and giving Carter the benefit of the doubt, we assume that he means that the Hospital revoked his privileges for fear of being cut off from federal funds if it did not take actions to eliminate abuses reported by the Foundation. Interpreting Carter's allegation in the light most favorable to him, we also assume that the Foundation's negative PSRO report of his professional activities influenced the Hospital's decision to dismiss him.

The Supreme Court, discussing *Blum* in their subsequent decision in *Rendell-Baker v. Kohn*, 457 U.S. 830, 841, 102 S.Ct. 2764, 2771, 73 L.Ed.2d 418 (1982), said:

> There [in *Blum* ] the State was indirectly involved in the transfer decisions challenged in that case because a primary goal of the State in regulating nursing homes was to keep costs down by transferring patients from intensive treatment centers to less expensive facilities when possible. Both state and federal regulations encouraged the nursing homes to transfer patients to less expensive facilities when appropriate.

Here, too, the State was involved only to the point of encouraging the Hospital to comply with its regulations controlling abuses in the Medicare and Medicaid programs. The Foundation's negative PSRO report of Carter's activities was made by area physicians applying local medical standards of care, diagnosis, and treatment. We perceive the Hospital's fear that the Foundation, acting as a PSRO, could terminate its Medicare and Medicaid payments because of inefficient health care no differently from the nursing home's fear in *Blum* that the State could impose penalties and deny Medicaid reimbursement for patients permitted to stay at the facility in violation of government criteria. Without more specific and egregious conduct by the Foundation and the Hospital, all of this takes Carter not much farther than *Modaber*, and his generalized allegation of "appeasement" is certainly no more than the ever-present threat of penalties present in *Blum* and recognized as "too slim" to comprise state action. The Hospital, like the nursing home in *Blum*, was not acting at the behest of the State.

We conclude, therefore, that the Hospital's termination of Carter's professional privileges did not involve state action under the Fourteenth Amendment and that Carter failed to state a claim upon which relief may be granted under § 1983. *See Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). The district court should have granted the Hospital's motion to dismiss, although under the provisions of F.R.Civ.P. 12(b)(6), rather than F.R.Civ.P. 12(b)(1) as initially requested by the Hospital. *See Dennis v. Hein*, 413 F.Supp. 1137 (D.S.C.1976) (12(b)(1) motion treated as 12(b)(6) motion); *see also York v. Story*, 324 F.2d 450 (9th Cir.1963). We, therefore, do not reach the issue of whether the court should have conducted an evidentiary hearing on the effect of the settlement agreement or whether the settlement agreement was a sufficient basis for dismissal. A district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice. That determination is within the district court's discretion. Because we are affirming on Rule 12(b)(6) grounds which were not the basis for dismissal by the district court, we remand for its decision whether to dismiss

with or without prejudice and express no thoughts on the merits of that determination.

AFFIRMED AND REMANDED FOR ENTRY OF DISMISSAL ORDER.